2026-1037

# United States Court of Appeals
# for the Federal Circuit

---

**TARGET GENERAL MERCHANDISE, INC.,**

Plaintiff-Appellant,

*v.*

**UNITED STATES,**

Defendant-Appellee.

---

Appeal from the United States Court of International Trade,
Consol. Court No. 15-cv-00069, Judge Lisa W. Wang

---

**PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT,
TARGET GENERAL MERCHANFISE INC.**

---

John M. Peterson
  *Counsel of Record*
Patrick B. Klein
Sanzida Talukder
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Suite 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

January 22, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1037

**Short Case Caption** Target General Merchandise Inc. v. US

**Filing Party/Entity** Target General Merchandise Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/23/2025

Signature:  /s/ John M. Peterson

Name:  John M. Petrson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Target General Merchandise Inc. | | Target Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable              ☐     Additional pages attached

| | | |
|---|---|---|
| Maria Celis | Russel Semmel | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable              ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTEREST ................................................................ ii

TABLE OF CONTENTS ......................................................................... iii

TABLE OF AUTHORITIES .....................................................................iv

STATEMENT OF RELATED CASES ......................................................1

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES................................................................2

SUMMARY OF THE ARGUMENT .......................................................10

ARGUMENT ..........................................................................................13

I.     Standard of Review.........................................................................13

II.     The Imported LED Products Imported After January 1, 2017, are Properly Classified in Heading 8539.50, HTSUS........................................................14

III.     LED Lamps Imported Prior to January 1, 2017, are Classifiable Under Subheading 8543.70.70, HTSUS.................................................28

CONCLUSION ......................................................................................35

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*AFL-CIO v. Chao*, 409 F.3d 377 (D.C. Cir. 2005) ..................................................32

*Agfa Corp. v. United States*, 520 F.3d 1326 (Fed. Cir. 2008) ................................17

*Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461 (2004)......................32

*Aromont USA Inc. v. United States*, 671 F.3d 1310 (Fed. Cir. 2012)....................25

*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998).........................................33

*BASF Corp. v. United States*, 30 C.I.T. 227 (2006) ...............................................17

*Bell BCI Co. v. United States,* 570 F.3d 1337 (Fed. Cir. 2009) .............................13

*Brandt v. United States*, 710 F.3d 1369 (Fed. Cir. 2013).......................................32

*C.J. Tower & Sons of Niagara Inc., v United States,* 52 Cust. Ct. 14 (1964). ........32

*C.J. Tower & Sons v. United State*s, 673 F.2d 1268 (C.C.P.A. 1982) ...................19

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999). ................. 14, 30

*Crosse & Blackwell Co. v. United States*, 36 C.C.P.A. 33 (1948) .........................15

*Deckers Outdoor Corp. v. United States*, 714 F.3d 1363 (Fed. Cir. 2013) ............17

*Dofasco Inc. v. United States*, 31 C.I.T. 1592 (2007)............................................23

*Gerson Co. v. United States*, 254 F. Supp. 3d 1271 (Ct. Int'l Tr. 2017). ..............31

*Gerson Co. v. United States*, 898 F.3d 1232 (Fed. Cir. 2018)........................ passim

*Guess? Inc. v. United States*, 944 F.2d 855 (Fed. Cir. 1991) .................................13

*Jansen Ortho, LLC v. United States*, 995 F.3d 981 (Fed. Cir. 2021). ...................15

*Kalle USA Inc. v. United States*, 923 F.3d 991 (Fed. Cir. 2019) ..................... 30, 32

*La Crosse Tech. v. United States*, 723 F.3d 1353 (Fed. Cir. 2013)........................30

*Link Snacks, Inc. v. United States*, 742 F.3d 962  (Fed. Cir. 2014).......................14

*Lynteq Inc. v. United States*, 976 F.2d 693 (Fed. Cir. 1992) .................................13

*Mita Copystar Am. v. United States*, 21 F.3d 1079 (Fed. Cir. 1994) .....................18

*Nootka Packing Co. v. United States*, 22 C.C.P.A. 464 (1935)..............................15

*Norman G. Jensen v. United States*, 84 Cust. Ct. 76 (1980). .................................23

*NSK Ltd. v. United States*, 115 F.3d 965 (Fed. Cir. 1997) .....................................23

*Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998)..................14

*Phila. Energy Sols. Refin & Mktg. LLC v. United States*, 89 F.4th 1364 (Fed. Cir. 2024)................................................................................................23

*Primal Lite v. United States*, 182 F.3d 1362 (Fed. Cir. 1999)................................22

*Rubie's Costume Co. v. United States*, 337 F.3d 1357 (Fed. Cir. 2003) .................32

*Russ Berrie & Co., v. United States*, 329 F. Supp. 3d 1345 (Ct. Int'l Tr. 2018)................................................................................................22

*Second Nature Designs Ltd. v. United State*s, 660 F. Supp. 3d 1352 (Ct. Int'l Tr. 2023)................................................................................................25

*Simod Am. Corp. v. United States*, 872 F.2d 1572 (Fed. Cir. 1989). .............. 18, 19

iv

*Sorensen v. Sec'y Treasury*, 475 U.S. 851 (1986) ...................................................23

*T.M. Duche & Sons, Inc. v. United States,* 44 C.C.P.A. 60 (1957) .........................15

*Trijicon Inc. v. United States*, 2024 Ct. Int'l Tr. LEXIS 18 (2024)................. 21, 22

*Trumpf Med. Sys. v. United States*, 34 C.I.T. 1404 (2010)....................................22

*United States v. Bruckmann*, 65 C.C.P.A. 90 (1978)...............................................15

*United States v. UPS Customs Brokers Inc.*, 30 C.I.T. 1612 (2006) ......................32

*Universal Electronics Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997)..........14

**Statutes**

19 U.S.C. § 3004 ......................................................................................................34

28 U.S.C. § 1295 ........................................................................................................2

28 U.S.C. § 1581 ........................................................................................................2

28 U.S.C. § 2107 ........................................................................................................1

28 U.S.C. § 2645 ........................................................................................................1

**Other Authorities**

Avnet, Inc., *LEDs and Their Rapidly Changing Form Factor*, (March 13, 2017)...................................................................................................................5

Bill Lewis, *What Size Light Bulb Can I Use?* (June 19, 2022),. ...............................6

Collins English Dictionary, definition of "lamp," CollinsDictionary.com. ............21

*Customs Headquarters Ruling H024762 of December 12, 2014* ...........................24

*Customs Headquarters Ruling H024874 of March 31, 2010* ........................... 20, 21

*Customs Headquarters Ruling H024876 of March 31, 2010* ........................... 19, 21

*Customs Headquarters Ruling H024878 of March 31, 2010;* ................................19

*Customs Headquarters Ruling H042586 of January 29, 2009*......................... 20, 21

*Customs Headquarters Ruling H095035 of March 31, 2010* ........................... 19, 21

*Customs Headquarters Ruling H254047 of November 4, 2014* .............................24

*Customs Headquarters Ruling H966952 of August 18, 2004*.................................21

English Oxford Dictionaries, definition of "lamp," ...............................................20

LED Lighting, U.S. Dep't of Energy, https://www.energy.gov/energysaver/led-lighting (last accessed January 22, 2026)...........................................................................................................5

*Liteline Corp. v. President of the Canada Border Services Agency*, AP-2014-029 (2016). ....................................................................................... 16, 32

*Merriam-Webster Dictionary*, definition of "lamp," Merriam-Webster.com .........20

Modifications to the Harmonized Tariff Sched. Of the United States under Sec. 1206 of the Omnibus Trade and Competitiveness Act of 1988 annex I USITC Pub. No. 3898 (Dec. 2006). ........................................................................34

*New York Ruling Letter N297843 of June 29, 2018* ..............................................23

*New York Ruling Letter N299720 of August 13, 2018*...........................................23

Page(s)

*New York Ruling N262787 of April 7, 2015.* ...........................................................24

*New York Ruling N280074 of October 25, 2016* ...................................................24

*New York Ruling N286276 of June 6, 2017* ...........................................................24

*New York Ruling N289194 of March 23, 2017* .......................................................24

Proclamation No. 8097, 72 Fed. Reg. 453 (Jan. 4, 2007) .......................................34

*See* Corey Graves, *Jarvis Lighting*, *LED Lighting Technology Explained: A Comprehensive Guide* (May 23,2023) .................................................................4

Plaintiff-Appellant, Target General Merchandise, Inc., in accordance with Rules 28(a) and 32(a) of the Federal Rules of Appellate Procedure and the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, hereby submits its principal brief in this appeal.

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of Practice of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant, Target General Merchandise, Inc., makes the following statement:

1. Counsel for Plaintiff-Appellant are not aware of any action, currently pending in the U.S. Court of International Trade, which will directly affect or be affected by this Court's decision in the instant appeal.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant, Target General Merchandise, Inc., ("Target," "Plaintiff-Appellant," or the "Company"), appeals from the final judgment of the U.S. Court of International Trade ("CIT" or "Trade Court") in *Target General Merchandise, Inc. v. United States*, Slip Op. 25-104, dated August 13, 2025. Appx3-Appx29.

Target filed a timely notice of appeal on October 8, 2025, pursuant to 28 U.S.C. §§ 2107 and 2645(c), and Rule 4(a)(4) of the Federal Rules of Appellate procedure. The CIT possessed subject matter jurisdiction of this action pursuant to 28

U.S.C. § 1581(a), and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). The appeal was docketed in this Court on October 9, 2025.

## STATEMENT OF THE ISSUES

1. Whether the Trade Court properly determined during "PERIOD ONE" from February 7, 2014, through March 28, 2014 that Plaintiff-Appellant's imported merchandise was properly classified under Heading 9405, HTSUS and not subheading 8543.7070, HTSUS?

2. Whether the Trade Court properly determined during "PERIOD TWO" from September 7, 2018, through October 12, 2018 that Plaintiff-Appellant's imported merchandise was properly classified under Heading 9405, HTSUS and not subheading 8539.50 HTSUS?

## STATEMENT OF THE CASE

### I.   Development of LED Lighting

LED technology operates by running an electric current through a light-emitting diode ("LED") which contains electroluminescent semiconductor material. The electrons coursing through the semiconductor material (usually a powder or thin film) excite the atoms of the electroluminescent material and cause it to produce visible light.

The concept of electroluminescence was first discovered in 1907 by the British scientist H.J. Round, a radio pioneer who first observed electroluminescence

within a solid-state diode. In 1962, Texas Instruments scientists Robert Biard and Gary Pittman patented an LED which used a gallium arsenide (GaAs) crystal and emitted 890 nm of infrared light. Later that year, General Electric Company engineer Nick Holonyak, Jr. created the first practical visible spectrum LED, which used a Gallium arsenide phosphide (GaAsP) crystal and emitted a deep red light. The first commercially available LEDs were launched in 1968, but were unpopular because of the deep red light they generated.[1]

During the 1970s, scientists continued to make progress in LED development. General Electric developed a yellow light LED, and Stanford scientists patented a blue LED in 1976. In 1989, the Cree Company marketed a blue silicon carbide LED, which had low efficiency.[2] In the 1990s, Japanese scientists Isamu Akasaki, Hiroshi Amano and Shuji Nakamura advanced the development of blue LEDs, including blue-white LEDs, in the process achieving LED lifecycles of up to 50,000 hours[3], or

---

[1] Taryn Engmark, *The (Accidental) Invention of the LED,* Embedded Computing Design Magazine (October 20, 2021), https://embeddedcomputing.com/technology/analog-and-power/the-accidental-invention-of-the-led.

[2] *Id.*

[3] *Id.*

roughly 50 times the life of an incandescent bulb. Ultimately, white LEDs were developed and perfected by combining other LED colors, as shown in the diagram below: [4]



The increase in efficiency dramatically improved the cost-saving advantages of LEDs, causing governments to promote and mandate their use through a combination of energy policies, regulations and incentives.[5] One prominent example of

[4] *Id*.

[5] *See* Corey Graves, *Jarvis Lighting*, *LED Lighting Technology Explained: A Comprehensive Guide* (May 23,2023) https://www.jarvislighting.com/blogs/jarvis-lighting-insights/led-lighting-technology#A%20Brief%20and%20Luminous%20History%20of%20Led%20Lighting

this promotion in the United States is the ENERGY STAR program, run jointly by

the United States Department of Energy ("DOE"), and the Environmental Protection

Agency ("EPA").[6]

As LED technology replaced and displaced historical incandescent and fluorescent lighting, the increased flexibility of LED technology has allowed form factors

to change. Initially, LED lamps or bulbs had to fit into the luminaires or other fittings

which had housed other types of lamps. As a major LED lamp manufacturer, noted:

> From street lamps to industrial applications, LED use goes well beyond screwing an LED light into a desk lamp. Historically, retrofit LEDs have often emulated the form factor of the lamps they were replacing. Anything out of the ordinary was problematic, but this is rapidly changing.

> There are hundreds of millions of fluorescent strips and industrial fixtures installed in varying locations and applications throughout North America. LED luminaires are replacing these fixtures rapidly, combining aesthetics, high performance and slim, modern form factors. Energy cost is easily lowered by up to 25 percent with these replacements, and ongoing bulb maintenance is becoming a thing of the past.[7]

Standard incandescent and fluorescent light bulbs are limited in size by various form-factors, such as the heat generated by electrical resistance in an incandescent filament, and the dispersion of gases in a fluorescent bulb. The wattage ratings

---

[6] *See* LED Lighting, U.S. Dep't of Energy, https://www.energy.gov/energysaver/led-lighting (last accessed January 22, 2026).

[7] Avnet, Inc., *LEDs and Their Rapidly Changing Form Factor*, (March 13, 2017), https://www.avnet.com/americas/resources/article/leds-their-rapidly-changing-form-factor/

of the various luminaires in which these bulbs are also limiting.[8] Yet, the LED lighting can still take on diverse sizes and forms. Thus, in the case of LED lighting:

> Adjusting form factors ultimately comes down to achieving the right amount of light output from a lighting fixture. While single LEDs might not meet the needs of applications that require high luminosity, multiple LEDs can be used effectively in arrays. And while the lighting fits the bill, the downside of arrays can include their size, their assembly price tag and their level of complexity when trying to match correlated color temperature (CCT)[9].

What this means is that while most people think of a light "bulb" as composing uniform elements in a given size range—*e.g.,* a light source, base for drawing power, and globe—LED "bulbs" consisting of light sources, power-providing drivers and protective caps, may be radically different in size and shape when compared against traditional incandescent or fluorescent light bulbs.

## II.    The Imports Subject to This Case

There are one hundred and sixty-two unique imported products subject to the Trade Court's opinion. Each of the imported products creates light by means of an internal semiconductor making an LED array. When the LED, which is composed of photosensitive material, is energized by an electrical current, the semiconductor material is stimulated and energized, resulting in the production of light. The name

---

[8] *See, e.g.,* Bill Lewis, *What Size Light Bulb Can I Use?* (June 19, 2022), https://www.thespruce.com/what-size-light-bulb-to-use-2175029.

[9] Avnet, Inc., *supra* note 7.

of the process describing the production of light by a LED in response to an electrical current is known as electroluminescence. Appx6.

Target primarily marketed and sold the imported merchandise at its approximately 2,000 retail stores in the United States. Depending on a given product's specific purpose, it may have been displayed and sold in numerous different areas of Target retail stores such as houseware, lawn and garden, or seasonal departments.

The parties and CIT have grouped products into various product categories in order to ease the presentation of plaintiff's claims and legal analyses. Appx6. as follows:

1. LED candles, LED candle sets; tea lights and votive (37 products);
2. LED string, icicle and net lights (93 products);
3. Table/Desk Lamps; (10 products);
4. Nightlight (1 product);
5. Solar Path Lights (17 products);
6. LED Metal Lanterns (2 products);
7. LED Christmas Trees (2 products).

**LED candles, LED candle sets, tea lights, and votive candles** provide end users with both utilitarian and decorative illumination. Appx6-Appx7. A pillar candle is usually larger and more substantial, while a votive or tea light candle is smaller and typically intended for insertion within a container. Appx7. These products consist of LED lighting elements, plastic candle housings, batteries, and a switch. Appx6-Appx7. There are thirty-seven products in this category. There are four solar LED candles contained in various sizes of rattan housing. Appx288-Appx289. There

7

are two battery-operated packs of LED tea light candles, one 12-pack and one 24-pack. Appx7. There are thirty-one individual battery-operated LED candle products. These products may contain multiple candles, in different sizes and colors, with or without added scents or timers for indoor or outdoor use.

**LED string lights** are LED lighting elements with plastic caps, copper wiring harnesses with plastic or rubber sheeting, and long wires with LED bulbs arranged along the wire of the string. Appx8. Some of the string lights can be powered by solar energy or batteries. Appx8. Icicle lights are identical to string lights in concept, but they are designed to hang in a way that resembles an icicle. Appx8. Net lights are string lights designed to drape like a net over a bush or other outdoor surfaces, covering larger areas than normal string lights. Appx8. The majority of the string lights at issue were branded and resold by Philips, a third-party company, while some were sold under Target's private label brands Room Essentials and Wonder-shop. Appx8-9. There are ninety-three string light products subject to this litigation. Appx8., Appx290.

**Table/desk lamps** are used to provide utilitarian lighting to individuals working or sitting at a desk or table. Appx9. Uniquely, the clip-on grill light consists of an LED lighting element attached to a flexible handle with a clip that can clasp onto the grill handle. Appx9. Desk or Table lamps consist of an LED lighting element, a plastic or metal base, a plastic or metal neck/body, an electrical power cord and plug,

8

and may include task lights. Appx9. Table/desk lamps were sold in Target's Lighting and Wall Décor department. Appx9. There are ten table/desk lamps subject to this litigation. Appx9, Appx296.

A **nightlight** is used for illuminative or decorative purposes, specifically to provide local lighting for safety at night. Appx9. A nightlight consists of an LED lighting element, a plastic cap, and an electrical plug to connect into the wall. Appx9. The nightlight subject to this litigation was sold under Target's private label Circo, which is no longer in use. Appx10. There is a single nightlight subject to this litigation. Appx297. Nightlights can also be used for aesthetically pleasing decorative purposes.

The **solar path lights** are used for utilitarian and decorative illumination on sidewalks, walkways, pathways, or walking paths. Appx10. The path lights are solar-powered and automatically turn on when the sun goes down. A path light consists of an LED lighting element, a copper wire harness with rubber or plastic sheeting, a plastic base for insertion into the soil or ground, a decorative cap, and a solar power source. Appx10. There are 16 path lights subject to this litigation. Appx10, Appx297.

The next category of products is **LED metal lanterns**. There are two LED metal lanterns subject to this litigation. Appx10, Appx298. The metal lanterns consist of an LED lighting element housed in a plastic or metal lantern with plastic or

9

glass windows and are used to provide utilitarian or decorative lighting. Appx10. The metal lanterns were sold under Target's private label brand Smith & Hawken and were sold in the Outdoor Living Department of Target. Appx10-Appx11.

In addition, the Trade Court ordered that one Category of product, artificial Christmas trees, be reliquidated duty free as "festive articles" under subheading 9505.10.25, Plaintiff does not appeal this category of goods, as it will be owed duty refunds on the product. Appx21, Appx298.

### III.   Proceedings at the Trade Court

At the Trade Court the parties filed Cross Motions for Summary Judgment. After oral argument the Trade Court granted the Government's motion for summary judgment and denied Target's motion, holding that all of the goods were classifiable under Heading 9405.

### SUMMARY OF THE ARGUMENT

For goods in Period One, Target submits that the products are all properly classifiable under one provision:

- Subheading 8543.70.70, HTSUS: an *eo nomine* provision covering "Electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof: Other machines and apparatus; Electric luminescent lamps," dutiable at 2% *ad valorem*.

In *Gerson Co. v. United States*, 898 F.3d 1232 (Fed. Cir. 2018), this Court, addressing the classification of certain battery-powered LED votive candles, rejected classification under subheading 8543.70,70, HTSUS, based on the superior heading language: "electrical machines and apparatus." The Federal Circuit reasoned that:

> … it is "plausible" to read heading 8543 broadly as encompassing Gerson's candles, at least in a "hyper-technical sense," because the candles use electricity to operate and therefore arguably qualify as "electrical machines and apparatus"

898 F.3d at 1236. However, reading subheading 8543.70.70 in context with other provisions of the tariff, the Federal Circuit held:

> If one were to read heading 8543 as covering Gerson's candles, it would cover every electric lamp, because all such lamps use electricity to generate light. And, by operation of Note 1(f) [to Chapter 94, HTSUS], such lamps could not be classified under heading 9405. In other words, heading 9405 would be constrained to only non-electric lamps. That reading, as the Trade Court noted, "would impose a specific, and drastic, limitation on the scope of heading 9405, HTSUS that the article description for that heading does not express or suggest." *Gerson*, 254 F. Supp. 3d at 1278. In fact, such a reading would effectively remove electric "searchlights" and "spotlights" from heading 9405 even though those devices are expressly provided for in that heading. *See* HTSUS Hdg. 9405 ("Lamps and lighting fittings including searchlights and spotlights and parts thereof" (emphasis added)). We agree with the Trade Court, therefore, that Gerson's candles do not fall within heading 8543.

*Id*. at 1237. The Federal Circuit's concern appears not to be that other (non-LED) lights would be classified in subheading 8543.70.70's provision for "electric luminescent lamps," but rather in the "basket" provision for "other" electrical machines and apparatus" in 8543.70.96. Since *Gerson*, the cadence of decisions in the United

States and elsewhere has been that Chapter 85 covers lighting components but not *finished* lighting apparatus.

As discussed herein, Target submits that some of the LED lights at bar are distinguishable from the votive lights involved in *Gerson* and are properly classified under subheading 8543.70.70.

The classification of LED lamps which Target imported during Period Two, involves a different claim and a different tariff provision which is not affected by the *Gerson* decision.

Effective January 1, 2017, the World Customs Organization ("WCO"), as part of its five-year review of the Harmonized System ("HS") Nomenclature, created a new provision at subheading 8539.50, HTSUS, covering "Electrical filament or discharge lamps, including sealed beam lamp units and ultraviolet or infrared lamps; arc lamps; light-emitting diode (LED) lamps; parts thereof: "Light emitting diode lamps." The United States adopted this provision into its HTSUS, assigning a rate of 2% *ad valorem*.

During this second period—September 7, 2018, through October 12, 2018—CBP classified Target's imported LED lamps in liquidation under the following provisions:

- Subheading 9405.30.00, HTSUS, as "Lighting sets of a kind used for Christmas trees," with a duty rate of 8%;

- Subheading 9405.40.60, HTSUS, as "Other electric lamps and lighting fittings: Of base metal: Other," with a duty rate of 6%;

- Subheading 9405.40.8410, HTSUS, as "Lamps and lighting fittings including searchlights and spotlights and parts thereof, not elsewhere specified or included; illuminated signs, illuminated nameplates and the like, having a permanently fixed light source, and parts thereof not elsewhere specified or included: Other electric lamps and lighting fittings: Of base metal: Other: Other lighting sets[,]"with a duty rate of 3.9% *ad valorem*.

Plaintiff contends that the lamps imported during this second period are provided for *eo nomine* by, d therefore are properly classified under subheading 8539.50, HTSUS.

## ARGUMENT

### I. Standard of Review.

This Court reviews legal holdings *de novo* and examines factual findings for clear error. *Bell BCI Co. v. United States,* 570 F.3d 1337, 1340 (Fed. Cir. 2009). The Court also reviews the lower court's interpretation of statutory provisions *de novo* and without deference. *Lynteq Inc. v. United States*, 976 F.2d 693, 696 (Fed. Cir. 1992); *Guess? Inc. v. United States*, 944 F.2d 855, 857 (Fed. Cir. 1991). This Court reviews decisions of the CIT denying motions for summary judgment, and granting cross-motions for summary judgment, *de novo*.

Where, as here, matters are resolved upon summary judgment, and there are no disputed factual issues, this Court's inquiry resolves entirely into one of law, which this Court reviews *de novo,* and without regard to any presumption of correctness which might otherwise attach to Customs' determination in liquidation. *See Universal Electronics Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997).

## II. The Imported LED Products Imported After January 1, 2017, are Properly Classified in Heading 8539.50, HTSUS.

The imported LED products imported after January 1, 2017, are provided for *eo nomine* in heading 8539.50, HTSUS, and CBP erred in classifying them in liquidation under heading, 9405, HTSUS.

"To determine the meaning of an HTSUS provision, the court applies the GRIs in numerical order, beginning with GRI 1 and reaching subsequent GRIs if analysis under the preceding GRI does not yield proper classification of the subject merchandise." *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965 (Fed. Cir. 2014). Under GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." "A court first construes the language of the heading, and any section or chapter notes in question." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*,

195 F.3d 1375, 1379 (Fed. Cir. 1999). In interpreting the terms of a tariff provision "[a] court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Id.*

Classification of the subject merchandise is further dictated by the canon of statutory construction that, absent a clearly expressed Congressional intent, an *eo nomine* provision for an article covers all forms of the named article. An *eo nomine* designation is one which describes a commodity by a specific name, usually one well known in commerce. *See United States v. Bruckmann*, 65 C.C.P.A. 90 (1978). *Eo nomine* designations are to be construed according to their common and commercial meanings, which are presumed to be the same. *Jansen Ortho, LLC v. United States*, 995 F.3d 981, 988 (Fed. Cir. 2021). Of prime importance here, an *eo nomine* designation, absent contrary legislative intent, is to be interpreted to include all forms of the named article. *Nootka Packing Co. v. United States*, 22 C.C.P.A. 464, 470 (1935); *Crosse & Blackwell Co. v. United States*, 36 C.C.P.A. 33, 35 (1948); *T.M. Duche & Sons, Inc. v. United States,* 44 C.C.P.A. 60, 63 (1957).

The subheading 8473.70.71, HTSUS, provision for "electro-luminescent lamps" was an effort by the drafters of the HTSUS to create a specific provision covering LED lighting products and to assign them a duty rate of 2% *ad valorem*. As the Federal Circuit indicated in *Gerson*, this effort foundered on the shoals of

judicial interpretation of the tariff. While the parties in *Gerson* agreed that the products were "lamps" and functioned through electroluminescence, the placement of subheading 8543.70.70 subordinate to a four-digit tariff heading covering "electrical machines and apparatus" (a phrase which the *Gerson* Court conceded was "not free of ambiguity," 898 F.3d at 1236)--led that Court to limit application of the provision. Relying on definitions from *Webster's New World College Dictionary* 67 (4th ed. 2009), the court noted that "apparatus" referred to "any complex device or machine for a specific use," and that "machine" meant "a structure consisting of a framework and various fixed and moving parts, for doing some kind of work" and "any device thought of as functioning in such a way, as … an electronic computer").[10]

The enactment of subheading 8539.50, HTSUS, eliminates the problems the *Gerson* court detected with subheadings 8543.70.71 and 8543.70.71, HTSUS. It provides *eo nomine* for "light-emitting diode (LED) lamps," and is positioned below a four-digit heading (heading 8539, HTSUS) which also specifies "LED lamps," as within its coverage. Classification under subheading 8539.50 is not dependent on the lamps being considered "electrical machines or apparatus." The Trade Court impermissibly violated GRI I, and disregarded the *eo nomine* provision in holding that

---

[10] The Canadian International Trade Tribunal ("CITT") reached a similar conclusion in interpreting subheading 8543.70 of Canada's Customs Tariff. *See Liteline Corp. v. President of the Canada Border Services Agency*, AP-2014-029 (2016).

the subject products were classifiable under Heading 9405, HTSUS. Although the WCO Explanatory Notes are not binding, they are helpful in discerning the meaning of a tariff provision.[11] In this regard, the ENs to Chapter 85 provide that:

> This Chapter covers … (6) Certain electrical goods not generally used independently, but designed to play a particular role as components, in electrical equipment, *e.g.*, capacitors (heading 85.32), switches, fuses, junction boxes, etc. (heading 85.35 or 85.36), lamps (heading 85.39), thermionic, etc., valves and tubes (heading 85.40), diodes, transistors and similar semiconductor devices (heading 85.41), electrical carbons (heading 85.45).

The language "not generally used independently" admits of the possibility that some electrical goods used independently nonetheless fall within the Chapter. The ENs for Heading 85.39 provide that "The heading covers filament lamps, gas or vapour discharge lamps, arc-lamps and light-emitting diode (LED) lamps."

With respect to LED lamps, the ENs indicate that the coverage of the Heading is intended to be broad:

### (F) LIGHT-EMITTING DIODE (LED) LAMPS

> The light from these lamps is produced by one or more light-emitting diodes (LED). These lamps consist of a glass or plastic envelope, one or more light-emitting diodes (LED), circuitry to rectify AC power and to covert voltage to a level useable by the LEDs, and a base (e.g., screw,

---

[11] Explanatory Notes are "generally indicative of the proper interpretation of a tariff provision." *Agfa Corp. v. United States*, 520 F.3d 1326, 1239 (Fed. Cir. 2008) (citation omitted). "Unlike Chapter Notes, Explanatory Notes are not legally binding." *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1367 n. 1 (Fed. Cir. 2013). However, "the Explanatory Notes are persuasive authority for the court when they specifically include or exclude an item from a tariff heading." *see BASF Corp. v. United States*, 30 C.I.T. 227 (2006), aff'd, 497 F.3d 1309 (Fed. Cir. 2007).

bayonet or bi-pin type) for fixing in the lamp-holder. Certain lamps may also contain a heat sink.

These lamps are of various shapes, e.g., spherical (with or without a neck); pear or onion shaped; flame shaped; tubular (straight or curved); special fancy shapes for illuminations, decorations, Christmas trees, etc.

The enactment of subheading 8539.50, HTSUS, effective January 1, 2017,

changes the classification of LED lighting in meaningful ways:

> The lamps no longer need to meet the definition of "machines" or "apparatus;"

> These lamps are squarely excluded from classification under Chapter 94, HTSUS by operation of Note 1(f) to Chapter 94.

What remains is to determine the meaning of the word "lamp" as used in

Heading 8539, and in subheading 8539.50, which provides for:

Electrical filament or discharge lamps, including sealed beam lamp units and ultraviolet or infrared lamps; arc lamps; light-emitting diode (LED) lamps; parts thereof: Light-emitting diode (LED) lamps.

The HTSUS does not define "lamps," for purposes of classification. Where a specific

term is not defined in the tariff, Customs and the Courts may consult dictionaries

and other sources to determine their correct meaning. *Mita Copystar Am. v. United

States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) ("the term's correct meaning is its com-

mon meaning.") The common meaning of a term used in commerce is presumed to

be the same as its commercial meaning. *See Simod Am. Corp. v. United States*, 872

F.2d 1572, 1576 (Fed. Cir. 1989). To ascertain the common meaning of a term, a

court may consult "dictionaries, scientific authorities, and other reliable information sources" and "lexicographic and other materials." *C.J. Tower & Sons v. United State*s, 673 F.2d 1268, 1271 (C.C.P.A. 1982); *Simod*, 872 F.2d at 1576. The common meaning of a term is a question of law, rather than a question of fact. *See e.g., C.J. Tower & Sons v. United States*, 69 C.C.P.A. 128 (1982); *Cont'l Auto Sys. v. United States*, 589 F. Supp. 3d 1215 (Ct. Int'l. Tr. 2022).

The Trade Court's analysis violates GRI I because it relies on the precedent inapplicable to the proper analysis for the Subheading 8539.50, HTSUS. The enactment of the subheading meaningfully changed the GRI I analysis undertaken by the *Gerson* Court. In order to be classifiable under at the six-digit tariff level as "lamps," the products no longer needed to fit into the terms "machines and apparatus" at the four-digit level. In relying case law under the pre-2017 Heading 8543, HTSUS the Trade Court misapplied GRI I to the 2017 subheading 8539.50, HTSUS.

Customs has already defined LEDs in previous rulings, namely as " … semiconductor diodes, electronic devices that permit current to flow in only one direction. The diode is formed by bringing two slightly different materials to create a PN junction; or as "a semiconductor diode that emits light when a voltage is suitably applied." *See Customs Headquarters Ruling H024878 of March 31, 2010; Customs Headquarters Ruling H024876 of March 31, 2010* (LED modules for promotional buttons and displays); *Customs Headquarters Ruling H095035 of March 31, 2010*

(LED light set for bike handlebars); *Customs Headquarters Ruling H024874 of March 31, 2010* (various LED modules); *Customs Headquarters Ruling H042586 of January 29, 2009* (fiber optic lamp). It is accepted that all the merchandise in question are considered semiconductor devices that permit the flow of electric current through the formation of a PN junction. The next issue to address then is the definition of "lamp" for the purpose of classifying these goods as "LED lamps."

Such common understanding is also provided in numerous dictionary sources defining lamp consistently as:

> [A]ny of various devices for producing light or sometimes heat: such as
>
>> (1): a vessel with a wick for burning an inflammable liquid (such as oil) to produce light
>>
>> (2): a glass bulb or tube that emits light produced by electricity (such as an incandescent light bulb or fluorescent lamp)

*See Merriam-Webster Dictionary*, definition of "lamp," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/lamp (last accessed January 21, 2026):

> A device for giving light, either one consisting of an electric bulb together with its holder and shade or cover, or one burning gas or oil and consisting of a wick or mantle and a glass shade.

*See* English Oxford Dictionaries, definition of "lamp," en.ocofrddictionariyes.com. https://en.oxforddictionaries.com/definition/lamp (last accessed January 22, 2026):

A **lamp** is a light that works by using electricity or by burning oil or gas. *See Collins English Dictionary*, definition of "lamp," CollinsDictionary.com, https://www.collinsdictionary.com/dictionary/english/lamp (last accessed January 22, 2026).

The common element in all these definitions is the description of a device that emits light. This aligns with Customs' description of a lamp as "a device which provides an isolated source of heat or light." *Customs Headquarters Ruling H024876 of March 31, 2010* (LED modules for promotional buttons and displays); *Customs Headquarters Ruling H095035 of March 31, 2010* (LED light set for bike handlebars); *Customs Headquarters Ruling H024874 of March 31, 2010* (various LED modules); ); *Customs Headquarters Ruling H042586 of January 29, 2009* (fiber optic lamp); and *Customs Headquarters Ruling H966952 of August 18, 2004* (litecube). These rulings illustrate the variety of shapes and forms LED "lamps" can take, including litecubes, modules for buttons, and lights for bicycle handlebars. As noted earlier, LED technology enables the production of LED lights and "bulbs" in a much wider array of sizes, shapes, and forms compared to traditional incandescent or fluorescent lamps.

The Trade Court recently had the opportunity to determine the common meaning of the term "lamp" in *Trijicon Inc. v. United States*, 2024 Ct. Int'l Tr. LEXIS 18 (2024), where the Trade Court noted:

It is clear from the definition of lamp and the description of the subject imports that the subject imports are readily classified as lamps. A lamp is "any of various devices for producing light." Def.'s Ex. 7 (quoting Lamp, Webster's New World College Dictionary (3d ed. 1988)). It is undisputed that the subject imports produce illumination. Pl.'s SOF ¶ 26; see Def.'s Resp. to Pl.'s SOF ¶ 26 (admitting in relevant part). The Explanatory Note confirms that lamps "can be constituted of any material … and use any source of light." Def.'s Ex. 8 at XX-9405-1. Thus, a lamp can readily include one that involves beta radiation. It makes no difference that the Explanatory Notes do not specify tritium-powered lamps because the list is exemplary, not exhaustive. Moreover, Trijicon regularly refers to the subject imports as tritium lamps in various documents within the organization and with government agencies. *See* Def.'s Confid. Exs. 2-5, ECF Nos. 32-4, 32-5, 32-6, 32-7. At least one science journal also refers to the item used to illuminate the aiming point of a gun as a "lamp." *See* Def.'s Ex. 7 (reproducing Gunsights, McGraw-Hill Encyclopedia of Sci. and Tech. at 305 (9th ed. 2002) (" … the reticle may be illuminated by a small lamp to permit night use."). Meanwhile, Trijicon's averment that the "general public" would not consider the subject imports to be lamps is unsupported. The documented usage of the term "lamp" to describe the subject imports suggests that they meet the "common and commercial meaning[]" of lamps. *See Carl Zeiss*, 195 F.3d at 1379.

Trade courts have given a broad definition of the common meaning of the term "lamp" as used in the HTSUS. *See e.g.*, *Primal Lite v. United States*, 182 F.3d 1362 (Fed. Cir. 1999) (lights in strings); *Trujicon, supra* (term "lamp" includes both radiation and non-radiation powered lamps; *Russ Berrie & Co., v. United States*, 329 F. Supp. 3d 1345 (Ct. Int'l Tr. 2018) (term covers electrical and non-electrical lamps); *Trumpf Med. Sys. v. United States*, 34 C.I.T. 1404 (2010) (term includes specialized surgical lamps).

It is a natural presumption of legal construction that identical words used in different parts of the same law are intended to have the same meaning. *See, e.g.: Sorensen v. Sec'y Treasury*, 475 U.S. 851, 860 (1986); *Phila. Energy Sols. Refin & Mktg. LLC v. United States*, 89 F.4th 1364 (Fed. Cir. 2024); *Dofasco Inc. v. United States*, 31 C.I.T. 1592 (2007). The same rule applies to the construction of tariff schedules. *See, e.g: NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997), *Norman G. Jensen v. United States*, 84 Cust. Ct. 76 (1980). There is no legislative intent for the term "lamp"—as used in subheading 8539.50, HTSUS—to be interpreted more narrowly than in Heading 9405, HTSUS.

Considering the above definitions of the term "lamp," all subject LED products, from all categories, are devices that give off light or provide an isolated source of light. Such devices are commonly known and referred to as "lamps," and are therefore provided for *eo nomine* under subheading 8539.50, HTSUS.

Similar LED lamps have been classified by Customs under subheading 8539.50, HTSUS. Specifically, in *New York Ruling Letter N299720 of August 13, 2018*, Customs classified Christmas LED replacement C-9 bulbs under 8539.50.0020. Likewise, in *New York Ruling Letter N297843 of June 29, 2018*, Customs classified street LED lamps consisting of LEDs, PCBs, and a plastic lens under subheading 8539.50.0090, HTSUS, as other LED lamps.

The next question is whether the term "lamp" as used in the HTSUS, encompasses not only light "bulbs", but also light bulbs in lamp holders which are connected by electrical wiring to a power source and which use electrical connectors. The answer is clearly "yes." Customs has consistently classified light strings, featuring various lights in lamp holders, connected by electrical conductors, and featuring male- and female- plugs, under tariff provisions providing for "lamps." *See e.g.*, *Customs Headquarters Ruling H254047 of November 4, 2014; New York Ruling N286276 of June 6, 2017; New York Ruling N289194 of March 23, 2017; New York Ruling N280074 of October 25, 2016; New York Ruling N262787 of April 7, 2015*. As Customs explained, in *Customs Headquarters Ruling H024762 of December 12, 2014* (emphasis added):

> <u>CBP has previously determined that a "lamp" is a device which provides an isolated source of heat or light</u>. *See* Headquarters Ruling Letter (HQ) H024878, (LED module for ornaments); HQ H024876, (LED modules for promotional buttons and displays); HQ H095035, (LED light set for bike handlebars); HQ H024874, (various LED modules); HQ H042586, dated January 29, 2009 (fiber optic lamp); HQ 966952 , dated August 18, 2004 (litecube); and HQ 965248 , dated July 26, 2002 (bubble lights). *See also* The Random House College Dictionary (1973) at 752; Webster's New Collegiate Dictionary (1979) at 639.

Thus, the subject LED products are lamps and clearly fall under subheading 8539.50, HTSUS—an *eo nomine* provision for "light-emitting diode (LED) lamps." In the absence of a contrary legislative intent, an *eo nomine* provision covers all forms of the article described. *See Aromont USA Inc. v. United States*, 671 F.3d 1310, 1312

(Fed. Cir. 2012); *Second Nature Designs Ltd. v. United State*s, 660 F. Supp. 3d 1352, 1366 (Ct. Int'l Tr. 2023).

The enactment of subheading 8539.50, HTSUS, also serves to eliminate from consideration subheading 8543.70.71—a provision for "electric luminescent lamps." That provision only covers articles "not specified or included elsewhere in this chapter," meaning that once LED lamps were explicitly described in subheading 8539.50, classification under subheading 8543.70.71, HTSUS, is precluded.[12]

In misapplying GRI I to the products at issue, the Trade Court disregarded the common meaning of the word "lamp." The Trade Court held that "it is clear that the types of lamps classifiable under heading 8539 are those commonly referred to as light bulbs" and "heading 9405 includes 'decorative articles that also serve an illuminative function' and 'finished, standalone electric lamps used in the home.'" Appx24. In doing so, the Trade Court disregarded the common meaning of the word "lamp" established by this Court, and the Trade Court as device that emits light.

---

[12] For the same reason, the decision of the Federal Circuit in *Gerson Co. v. United States*, (Fed. Cir. 2018), has no bearing on the instant matter as to "Period Two" classifications. In *Gerson*, the Court held that certain LED candles were more properly classified in heading 9405, HTSUS, than in subheading 8543.70.71, HTSUS. However, at the time of the relevant facts in *Gerson*, subheading 8539.50, HTSUS, had not been enacted. The *Gerson* court noted that classification under a different provision in Chapter 85, HTSUS, was not precluded.

Products classified under subheading 8539.50, HTSUS cannot be classified under Heading 9405, HTSUS. To be sure, Chapter 94, HTSUS, contains numerous provisions for lamps. However, once it is established that Target's imported article is an LED lamp of subheading 8539.50, HTSUS, consideration of Chapter 94 provisions is clearly precluded by Note 1(f) to Chapter 94, HTSUS. The note reads that Chapter 94 "does not cover: … Lamps or light fittings of Chapter 85"). As such it is impossible for CBP's liquidation classification to apply to the imported LED products.

Even if, arguendo, Note 1(f) to Chapter 94 were not operative here, we note that Under GRI 1, Heading 9405 only covers "lamps and lighting fittings" which are "not elsewhere specified or included." The inclusion of these items *eo nomine* in subheading 8539.50 eliminates the possibility of classification in Heading 9405. The LED products imported after January 1, 2017, are properly classified under subheading 8543.70.70, HTSUS.[13]

---

[13] The fact that subheading 8539.50, HTSUS, is not confined to bulbs can be inferred from amendments to the Harmonized System nomenclature adopted by the World Customs Organization effective January 1, 2022 (which do not apply to this case). As of January 1, 2022, the six-digit subheading 8539.50 for "light emitting diode (LED) lamps" was split into two new subheadings:

Light-Emitting Diode (LED) Light Sources:
      8539.51      Light-Emitting Diode (LED) Modules
      8539.52      Light-Emitting Diode (LED) Lamps

Thus, with respect to subject articles imported after January 1, 2017, there should be no dispute that all subject LED lighting products qualify for classification as "light emitting diode (LED) lamps," of subheading 8539.50, HTSUS.

The Trade Court improperly applied the *Gerson* decision to subheading 8539.50. The creation of a provision for "light emitting diode (LED) lamps" in subheading 8539.50, HTSUS, makes the *Gerson* decision, and the analysis therein, irrelevant to goods imported after January 1, 2017. Indeed, the *Gerson* Court itself

---

The changes to the Harmonized System Explanatory Notes also clarify the distinction between lamps and modules:

> Light-emitting diode (LED) modules, which are electrical light sources based on light-emitting diodes (LED) arranged in electrical circuits and continuing further elements like electrical, mechanical, thermal or optical elements. They also contain discrete active elements, discrete passive elements, or articles of heading 85.36 or 85.42 for the purposes of providing power supply or power control. Light-emitting diode (LED) modules do not have a cap designed to allow easy installation or replacement in a luminaire and ensure mechanical and electrical contact.

The Explanatory Notes further clarify:

> The distinction between light-emitting diode (LED) modules and light-emitting diode (LED) lamps is that lamps have a cap designed to allow easy installation or replacement in a luminaire and ensure mechanical and electrical contact.

The division of subheading 8539.50 in this manner indicates that the replaced provision previously covered *both* LED light sources intended for luminaire installation and modular-style LED light sources.

admitted that the availability of a classification in heading 8539 would change its analysis:

> Given that heading 8543 does not refer to "lamps," it is questionable whether the plain language of heading 9405 and chapter 94's Note 1(f)—which each exclude from chapter 94's scope only "lamps" specified elsewhere—preclude classification of Gerson's lamps in heading 9405. In contrast to heading 8543, headings 8513 (certain "[p]ortable electric lamps designed to function by their own source of energy") and 8539 ("[e]lectrical filament or discharge lamps, including sealed beam lamp units and ultraviolet or infrared lamps; arc lamps") do refer to "lamps." Gerson does not argue on appeal that its candles are classifiable under either of these headings, however.

*Gerson Co. v. United States*, 898 F.3d 1232, n.3 (Fed. Cir. 2018). Here, the four-digit Heading 8539, and the six digit subheading 8539.50, each contain the phrase "lamps." Thus, Note 1(f) to Chapter 94 plainly excludes LED lamps imported after January 1, 2017, from classification in Chapter 94, HTSUS.

## III. LED Lamps Imported Prior to January 1, 2017, are Classifiable Under Subheading 8543.70.70, HTSUS.

The Trade Court applied the *Gerson* decision in full to Period I. Appx19.The next question is whether *Gerson* precludes all LED lamps imported prior to the enactment of subheading 8539.50, HTSUS (and the concomitant change in the four-digit heading), from being classified in Chapter 85, HTSUS. We submit it does not, and that the decision is binding on only with respect to "votive"-type lights of the kind at bar in *Gerson*.

28

In *Gerson*, the Court noted that Note 1(f) to Chapter 94, HTSUS, excluded from coverage therein "lamps or lighting fittings of Chapter 85." *Gerson Co. v. United States*, 898 F.3d 1236 (Fed. Cir. 2018). It concluded that Note 1(f) did not exclude LED lights from classification under Chapter 94 largely because the word "lamp" did not appear in the text of the four-digit tariff heading 8543, HTSUS. And yet the parties in *Gerson*, and the Court, were in apparent agreement that the products at issue were "lamps" in common meaning (a fact corroborated by the Court and Customs decisions defining "lamps" noted above). At the heart of the *Gerson* opinion is the notion that, where a Chapter Note excludes a named article or class of articles, those named articles must be specifically mentioned in the text of a tariff provision in order for the exclusionary note to be operative. We have found no authority for this extraordinary proposition.

Exclusionary Chapter Notes may designate excluded articles by general description. *See e.g.*, Note 1(a) to Chapter 85, HTSUS (excluding from the chapter "Electrically warmed blankets, bed pads, foot-muffs or the like; electrically warmed clothing, footwear or ear pads or other electrically warmed articles worn on or about the person"). Others may exclude articles based on description, tied to a tariff classification, without providing a definition for the described article (*see e.g.*, Chapter 85, Note 1(e) (excluding from the Chapter "Electrically heated furniture of chapter

29

94."). In some cases, an exclusionary Chapter Note may tie the exclusion to the classification of the excluded good in a particular HTSUS heading (*see e.g.*, Chapter 85, HTSUS note 1(b) (excluding "Articles of glass of heading 7011.")). In these cases, it falls to the reviewing court to determine the common meaning of the described but not defined term. *See e.g.*, *Kalle USA Inc. v. United States*, 923 F.3d 991 (Fed. Cir. 2019) (terms in the HTSUS must be defined according to their common and commercial meaning); *see also*, *La Crosse Tech. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013); *Carl Zeiss Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

As the Trade Court held, there is agreement that Target's articles are within the common meaning of the term "lamps." Appx18. Thus, the nature of the goods excluded from classification in Chapter 94 has been agreed upon. The other requirement of the exclusionary note is that the lamps be "of Chapter 85." At all relevant times here, the lamps—specifically "electric luminescent lamps"—were in fact described and provided for *eo nomine* in Chapter 85 within subheading 8543.70.70. That should have ended the inquiry altogether as to the effect of Note 1(f) to Chapter 94 because electric luminescent lamps, being provided for in Chapter 85, could not be classified in Chapter 94.

However, the *Gerson* Court went a step further in its analysis, which was unnecessary. It did not concentrate on whether any of the lights specified in Heading

30

9405, HTSUS, could have been classified under subheading 8543.70.70. Unless these lights were "electric luminescent lamps," they would not fit under that sub-heading. The CIT in *Gerson* acknowledged that the products in question were "lamps" and could also plausibly be considered "electrical machines and apparatus." *Gerson*, 254 F. Supp. at 1276. The CIT instead examined whether some lights described in heading 9405, HTSUS, might be classified under a different provision, specifically subheading 8543.70.96, HTSUS, which covers "Other" "Electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter." This analysis was unnecessary for applying the exclusion set forth in Chapter 94, Note 1(f), which only requires that the excluded lamps be classified under "Chapter 85" without specifying a particular tariff classification.

It is analysis, the *Gerson* court and the Trade Court violated two important canons of tariff and statutory construction. First, it disregarded GRI 1 to the HTS, which provides:

> The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings **and any relative section or chapter notes** and, provided such headings or notes do not otherwise require, according to the following provisions:

(Emphasis added). The effect of the *Gerson* Court and the Trade Courts interpretation was to focus solely on the terms of the headings, and to disregard the relevant Chapter Note, namely Chapter 94, Note 1(f). It is well-established that a court cannot

interpret an exclusionary note in disregard of the context of the exclusion as a whole. *See Kalle USA v. United States*, 923 F.3d 991 (Fed. Cir. 2019); *Rubie's Costume Co. v. United States*, 337 F.3d 1357 (Fed. Cir. 2003).

Second, the *Gerson* Court and Trade Courts interpretation violated the canon of statutory construction that a statute should not be interpreted in a way that renders it nugatory. *See e.g., Brandt v. United States*, 710 F.3d 1369, 1382 (Fed. Cir. 2013), *United States v. UPS Customs Brokers Inc.*, 30 C.I.T. 1612 (2006); *C.J. Tower & Sons of Niagara Inc., v United States,* 52 Cust. Ct. 14 (1964).[14] While the *Gerson* Court drew narrow distinctions based not on the statutory terms themselves, but on the greater "context" surrounding them, it violated important rules of statutory construction in the process. It interpreted subheading 8543.70.70, HTSUS, in such a way as to render it devoid of content and ensuring that absolutely **no** merchandise could be classified therein. It is a bedrock rule of statutory construction that a court "is obligated not only to construe the statute as a whole but to give meaning to each word of the statute". *AFL-CIO v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 (2004); *Asiana Air-*

---

[14] This was not an issue in the CITT's *Liteline* case, *supra* note 10, since Canada's Customs Tariff did not contain descriptive language similar to that of subheading 8473.70.70, HTSUS.

*lines v. FAA,* 134 F.3d 393, 398 (D.C. Cir. 1998). The *Gerson* Court not only emptied subheading 8543.70.70, HTSUS, of content and meaning, but disregarded Note 1(f) to Chapter 94 in the process despite the Note's preclusion of lamps provided for in Chapter 85 from classification within Chapter 94.

While the *Gerson* decision dealt with LED votives and candles—the decision should not be applied to other products of the type which Target has imported, as the Trade Court did. Appx18. Those goods unquestionably meet the definition of "elec - tric luminescent lamps " in subheading 8543 .70.70, HTSUS , and should be classified therein.

These lights are all classifiable as "Electric Luminescent Lamps," of subheading 8543.70.70, HTSUS, because they produce luminescence as a result of energy being delivered through a semi conductive material. Subheading 8543.70.70, HTSUS, provided at relevant times as follows:

> 8543   Electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof:
>
>      8543.70      Other machines and apparatus:
>
>      8543.70.70        Electric luminescent lamps.

Subheading 8543.70.70, HTSUS, is an eight digit "national" or "duty-rate" subheading that is unique to the HTSUS, and is not part of the six-digit international Harmonized Commodity Description and Coding System ("HS") tariff nomenclature on

which the U.S. tariff is based. It was added to the HTSUS by Presidential Proclamation 8097 in 2007. *See* Proclamation No. 8097, 72 Fed. Reg. 453 (Jan. 4, 2007); *see also* Modifications to the Harmonized Tariff Sched. Of the United States under Sec. 1206 of the Omnibus Trade and Competitiveness Act of 1988 annex I, at 133, USITC Pub. No. 3898 (Dec. 2006). Subheading 8543.70.70, HTSUS, is part of the legal text of the HTSUS, and considered to be "statutory law for all purposes." 19 U.S.C. § 3004(c)(1). LEDs are basic semiconductor devices that fit the description of "electrical machinery or apparatus," and are provided for *eo nomine* in Heading 8541. Although it is a national level subheading, it is undoubtedly part of the HTSUS, and it would be error for this Court to disregard it in determining the scope of the exclusionary language in Note 1(f) to Chapter 94, HTSUS.

The subject goods are lamps that contain internal LEDs that modify power transmitted from an internal battery, or external electrical current sources, to illuminate. Such illumination demands strict cooperation between interrelated parts—*e.g.*, cathodes, anodes, diffusers—each of which, in isolation, would be wholly incapable of performing the intended work, namely illumination. The useful traits of the articles are accomplished by direct virtue of the LED's basic semiconductor properties, which emit light by exciting electrons rather than by the production of heat—*i.e.*, "incandescence" describes light emitted by a solid that has been heated until it glows

34

or radiates light (cf. "luminescence" describes low temperature light emission.). Because the articles' illuminative properties are controlled by the semiconductor properties of the LED, no light emission would be possible if the products at issue did not function as an "electrical machine or apparatus."

## CONCLUSION

For all of the foregoing reasons, Plaintiff-Appellant, Target General Merchandise Inc., respectfully requests that this Court vacate the opinion and judgment of the CIT, hold that the imports from Period One are properly classified under subheading 8543.70.70, HTSUS, that the imports from Period Two are properly classified under subheading 8539.50, HTSUS, and remand this action to the Court of International Trade for further proceedings consistent with its holding.

Respectfully submitted.

  /s/ John M. Peterson  
John M. Peterson
*Counsel of Record*
Patrick B. Klein
Sanzida Talukder
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

*Attorneys for Plaintiff-Appellant*

January 22, 2026

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify that the foregoing Principal Brief of Plaintiff-Appellant, Target General Merchandise Inc., complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules. It was prepared using a proportionally-spaced typeface and includes 8,062 words.


   /s/ John M. Peterson
John M. Peterson

January 22, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2026, I electronically filed the foregoing Opening Brief of Target General Merchandise Inc., with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

  /s/ John M. Peterson  
John M. Peterson

January 22, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| TARGET GENERAL MERCHANDISE, INC., | |
| Plaintiff, | Before: Lisa W. Wang, Judge |
| v. | Consol. Court No. 15-00069 |
| UNITED STATES, | |
| Defendant. | |

## OPINION AND ORDER

[Denying Plaintiff's motion for summary judgment and granting Defendant's cross motion for summary judgment.]

Dated: August 13, 2025

Patrick B. Klein, Neville Peterson, LLP, of New York, NY, argued for Plaintiff Target General Merchandise, Inc. With him on the brief were Richard F. O'Neill and John M. Peterson.

Luke Mathers, Trial Attorney, U.S. Department of Justice, International Trade Field Office, of New York, NY, argued for Defendant United States. With him on the brief were Mathias Rabinovitch, Trial Attorney, Justin R. Miller, Attorney-In-Charge, Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Aimee Lee, Assistant Director. Of Counsel on the brief was Valerie Sorensen-Clark, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Wang, Judge: Before the court are cross motions for summary judgment. Pl.'s

Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 73; Def.'s Cross Mot. for Summ. J. and Resp.

in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 78. Plaintiff Target General

Merchandise, Inc. ("Plaintiff" or "Target") challenges U.S. Customs and Border

Protection's ("Customs") classification of 162 different light-emitting diode ("LED") lamps (collectively "imported merchandise"). Plaintiff challenges Customs' 2013 classification of imported merchandise under subheadings 9405.20.60, 9405.20.80, 9405.40.60, and 9405.40.80 of the Harmonized Tariff Schedule of the United States ("HTSUS"), arguing that the proper classification of the imported merchandise is subheading 8543.70.70. Pl.'s Mot. at 2. Plaintiff challenges Customs' 2017 classification of imported merchandise under subheadings 9405.30.00, 9405.40.60, and 9405.40.8410 of the HTSUS, arguing that the proper classification of the imported merchandise is subheading 8539.50. Id. at 2–4. The United States ("Defendant" or "government") cross moves for summary judgment, arguing that the imported merchandise in both periods is properly classified under heading 9405. Def.'s Mot. at 2.

For the following reasons, Plaintiff's motion for summary judgment is denied and Defendant's cross motion for summary judgment is granted.

## BACKGROUND

### I.      Procedural Background

Plaintiff is the importer of record for certain LED lamps imported between March 24, 2013 and May 14, 2013 ("Period 1"). Pl.'s Consol. Compl. ("Consol. Compl.") ¶ 14, ECF No. 29. Customs classified the merchandise under subheading 9405.20.60 or 9405.20.80 as "[e]lectric table, desk, bedside or floor-standing lamps"; 9405.30.00 as "[l]ighting sets of a kind used for Christmas trees"; or 9405.40.60/9405.40.80 as "[o]ther electric lamps and lighting fittings: Of base metal: Other." Id. ¶ 15. Plaintiff filed timely protests concerning the imported merchandise between August 18, 2014 and

September 16, 2014. Summons, ECF No. 1. Customs denied Plaintiff's timely protests

concerning the imported merchandise during the period between October 1, 2014 and

October 22, 2014. Id. Plaintiff contested the denial of the protest pursuant to 28 U.S.C.

§ 1581(a) on March 18, 2015. Id. (Civil Action No. 15-00069).

Plaintiff is the importer of record for certain LED lamps imported between August

16, 2017 and November 27, 2017 ("Period 2"). Consol. Compl. ¶ 17. Customs classified

the merchandise under subheading 9405.30.00 as "[l]ighting sets of a kind used for

Christmas trees"; 9405.40.60 as "[o]ther electric lamps and lighting fittings: Of base

metal: Other"; or 9405.40.8410 as "[l]amps and lighting fittings including searchlights

and spotlights and parts thereof, not elsewhere specified or included; illuminated signs,

illuminated nameplates and the like, having a permanently fixed light source, and parts

thereof not elsewhere specified or included: Other electric lamps and lighting fittings: Of

base metal: Other: Other lighting sets." Id. ¶ 18. Plaintiff filed a timely protest concerning

the imported merchandise on February 28, 2019. Summons, Court No. 19-00199, ECF

No. 1. Customs denied Plaintiff's timely protest concerning the imported merchandise

on October 22, 2019. Id. Plaintiff contested the denial of the protest pursuant to 28

U.S.C. § 1581(a) on November 6, 2019. Id. (Civil Action No. 19-00199).

The cases were consolidated on December 31, 2019. See Protests and Entries

from the Port of Savannah, GA for Count No. 19-00199, ECF No. 28. Plaintiff filed its

consolidated complaint on January 24, 2020, requesting that the court order: (1)

reliquidation of the imported merchandise under HTSUS subheading 8539.50.00,

8543.70.70, or 9405.40.80 as appropriate; and (2) a refund of excess duties paid, with interest. Consol. Compl. at 6–7.

## II.    Description of the Imported Merchandise

The imported merchandise consists of 162 LED lighting products. Pl.'s Mot. at 8; Def.'s Mot. at 6. Both parties agree that the models of merchandise can be grouped into seven categories: (1) candles; (2) string lights; (3) table lights; (4) nightlights; (5) path lights; (6) lanterns; and (7) artificial Christmas trees. Pl.'s Mot. at 8; Def.'s Mot. at 6. During Period 1, Plaintiff imported candle models, string light models, table light models, a nightlight model, path light models, and lantern models (product categories 1 through 6). Pl.'s R. 56.3 Statement of Material Facts Not In Disp. ("Pl.'s Facts") ¶¶ 11–52, ECF No. 73-2; Def. Resp. to Pl.'s R. 56.3 Statement of Material Facts Not In Disp. ("Def.'s Facts") ¶¶ 11–52, ECF No. 78-1. During Period 2, Plaintiff imported string light models and artificial Christmas tree models (product categories 2 and 7). Pl.'s Facts ¶¶ 22–32, 53–55; Def.'s Facts ¶¶ 22–32, 53–55.

All of the products at issue emit light via an LED light source. Pl.'s Facts ¶ 10; Def.'s Facts ¶ 10. The products are either solar-powered, battery-powered, and/or powered through an external power source by use of a wire with an electrical power connector. Pl.'s Facts ¶¶ 11–55; Def.'s Facts ¶¶ 11–55. They are all used for utilitarian or decorative illumination in or around the home. Pl.'s Ex. A, at 5, ECF No. 73-3; Def.'s Mot. at 21–22.

Target assigns each product a unique item number referred to as the Department Class Item ("DPCI") number. Pl.'s Facts ¶ 9; Def.'s Facts ¶ 9. A DPCI contains three

sets of numbers, separated by hyphens, and represents the department, class, and item number for each model of products sold by Target. Pl.'s Ex. B, Jarvis Dep. at 36:11–37:8, ECF No. 73-3. Target's imported merchandise is categorized into multiple departments such as outdoor living, bedroom, or seasonal products. Pl.'s Facts ¶ 8; Pl.'s Ex. A, at 6. The seven categories of merchandise are:

(1) LED candle models, candle set models, tea light models, and votive models

There are 37 LED candle models imported during Period 1. Pl.'s Facts ¶¶ 13–14; Def.'s Facts ¶¶ 13–14. The products consist of an LED lighting element in a plastic and/or wax housing and are sold in various sizes and colors. Pl.'s Facts ¶¶ 14–16; Def.'s Mot. at 7. The candle models can come with or without added scents or timers for indoor or outdoor use. Pl.'s Facts ¶ 21; Def.'s Mot. at 7.

Four models are solar-powered LED candles contained in various sizes of rattan housing and sold in Target's patio/grill department. Pl.'s Facts ¶¶ 14, 17; Def.'s Facts ¶ 17. There are two battery-powered packs of LED tea-light candle models sold in Target's candles department. Pl.'s Facts ¶ 18; Def.'s Facts ¶ 18. Two of the models are battery-powered LED candles contained in metal lanterns sold in the candles department. Def.'s Facts ¶ 18; Pl.'s Ex. C, Part 2, at 1321–22, ECF No. 73-5. There are 31 individual battery-operated LED candle models which resemble, in shape and size, pillar candles. Pl.'s Facts ¶ 19; Def.'s Facts ¶ 19. Of the 31 LED pillar candle models, six are described as being for outdoor use and are sold in Target's patio/grill department. Pl.'s Ex. C, Part 1, at 1229–1231, 1233; Def.'s Mot. at 7.

(2) String light models

There are 93 string light models imported during Period 1 and Period 2. Pl.'s Facts ¶¶ 22–23; Def.'s Facts ¶¶ 22–23. The string light models are composed of LED lighting elements arranged along a length of wire and utilize solar power, batteries, or an external power source via an electrical power connector. Pl.'s Facts ¶¶ 24–25; Def.'s Facts ¶¶ 24–25. The string light models can be divided into three categories: (1) "single" string lights; (2) icicle lights; and (3) net lights. Pl.'s Facts ¶ 22; Def.'s Mot. at 8. Single string light models have LED light sources arranged along a continuous strand of wire. Pl.'s Facts ¶ 24; Def.'s Mot. at 8; e.g., Pl.'s Ex. C, Part 1, at 1227–28. Icicle light models have a lead string but also multiple strings which branch off from the lead such that when the lead string is hung horizontally, the branched strings hang vertically and resemble icicles. Pl.'s Facts ¶ 28; Def.'s Facts ¶ 28; e.g., Pl.'s Ex. C, Part 1, at 1235–36. Net light models are LED light sources arranged along interconnected wires to form a grid in the shape of netting, often used to decorate bushes or other outdoor structures. Pl.'s Facts ¶ 29; Def.'s Facts ¶ 29; e.g., Pl.'s Ex. C, Part 1, at 1246–47.

The light bulbs used on the string light models come in a variety of colors, shapes, and sizes ranging from multi-colored and pear-shaped to plastic ghosts. See, e.g., Pl.'s Ex. C, Part 2, at 1307, 1357. The string light models' wire cording comes in a variety of colors such as green, white, clear, and black. See, e.g., Pl.'s Ex. C, Part 1. Some of the string light models have lighting effects while others provide constant lighting. See, e.g., Pl.'s Ex. C, Part 2, at 1301–03. Most of the string light models were branded and sold under Phillips, a third-party brand, with the remaining lights belonging to Target's private label brands: "Room Essentials"; "Wondershop"; and "Hyde and

EEK! Boutique". Pl.'s Facts ¶ 31; Def.'s Facts ¶ 31. Room Essentials is Target's home goods value brand. Jarvis Dep. at 65:16–66:9. Wondershop is Target's Christmas and winter holiday brand. Id. at 87:06–88:14. Hyde and EEK! Boutique is Target's Halloween merchandise brand, containing seasonal Halloween-based items. Id. at 117:9–18.

(3) Table light models

There are 10 table light models at issue in this litigation imported during Period 1. Pl.'s Facts ¶¶ 33–34; Def.'s Facts ¶¶ 33–34. Nine of the light models are designed to be placed on a desk or table, while one model is a grill light, designed to be clipped onto the side of a grill. Pl.'s Ex. E, at 9, ECF No. 73-6; Pl.'s Facts ¶ 37. The light models consist of an LED lighting element, a plastic or metal body, a base or clip, and an electrical power cord and plug. Pl.'s Facts ¶ 36; Def.'s Mot. at 10. The light models provide utilitarian lighting to a person working at a desk or grill. Pl.'s Facts ¶ 37; Def.'s Mot. at 10. The light models were sold in Target's lighting and wall décor department, except for the grill light model which was sold in the patio/grill department. Pl.'s Facts ¶ 38; Def.'s Mot. at 10; see Pl.'s Ex. C, Part 1, at 1222.

(4) Nightlight model

There is one nightlight model at issue in this litigation imported during Period 1. Pl.'s Facts ¶¶ 39–40; Def.'s Facts ¶¶ 39–40. The product consists of an LED lighting element, a plastic cap, and an electrical plug to connect into a wall socket. Pl.'s Facts ¶ 41; Def.'s Mot. at 11. It is a pink, flower-shaped light designed to provide local lighting in a person's bedroom while he or she sleeps. Pl.'s Facts ¶ 42; Jarvis Dep. at 104:20–

105:5. The nightlight model was sold under Target's private label "Circo," a former

children's home products brand. Pl.'s Facts ¶ 43; Jarvis Dep. at 105:17–20.

(5) Path light models

There are at least[1] 16 path light models imported during Period 1. Pl.'s Facts ¶¶

44–45; Def.'s Facts ¶¶ 44–45. The products consist of a solar-powered LED lighting

element, a copper wire harness with a rubber or plastic sheeting, and a base or stake

for insertion into the ground. Pl.'s Facts ¶ 46; Jarvis Dep. at 111:16–113:10. The path

light models, sold in Target's outdoor living department, are intended to illuminate an

outdoor walkway or sidewalk automatically at night. Pl.'s Facts ¶ 48; Jarvis Dep. at

111:16–113:10.

(6) Lantern models

There are two LED metal lantern models imported during Period 1. Pl.'s Facts ¶¶

49–50; Def.'s Facts ¶¶ 49–50. The lantern models contain an LED light source housed

in a square or cylindrical metal frame with plastic or glass windows. Pl.'s Facts ¶ 51;

Def.'s Mot. at 12. The lantern models are approximately 12 or 18 inches tall and 7

inches wide. Pl.'s Ex. C, Part 1, at 1232–33; Def.'s Mot. at 12. Target sold the lantern

models in its outdoor living department, under its private label brand, "Smith and

Hawken." Pl.'s Facts ¶ 52; Def.'s Mot. at 12. The lantern models are intended to be

---

[1] One of the DPCI numbers is described as a "set assortment" of path lights. Pl.'s Ex. C,
Part 2, at 1355. It is not clear which of the path light models are included in this
assortment. Jarvis Dep. at 114–15.

used in an outdoor living space, such as on a patio or front doorstep. Jarvis Dep. at

70:19–71:25.

      (7) Artificial Christmas tree models

      There are two LED Christmas tree models imported during Period 2. Pl.'s Facts

¶¶ 53–54; Def.'s Facts ¶¶ 53–54. The models measure 16 or 21 inches in height, 11 or

14 inches in diameter, and are constructed of polyvinyl chloride, copper, paper, iron,

plastic, and faux foliage. Pl.'s Ex. C, Part 2, at 1314–15. They are used for indoor home

décor and sold seasonally with Christmas articles. Pl.'s Facts ¶ 55; Def.'s Facts ¶ 55;

Jarvis Dep. At 98:9–17.

## JURISDICTION & STANDARD OF REVIEW

      The court has jurisdiction over this action. 28 U.S.C. § 1581(a) ("The Court of

International Trade shall have exclusive jurisdiction of any civil action commenced to

contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of

1930.").

      Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." CIT R. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

Specifically, "[i]n a tariff classification dispute, summary judgment is appropriate only

when 'there is no genuine dispute as to the nature of the merchandise and the

classification determination turns on the proper meaning and scope of the relevant tariff

provisions.'" Second Nature Designs Ltd. v. United States, 660 F. Supp. 3d 1352, 1373

(CIT 2023) (quoting Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed.

Cir. 2013)); see also Tyco Fire Prods. L.P. v. United States, 918 F. Supp. 2d 1334, 1339

(CIT 2013).

Faced with cross motions for summary judgment, the court will "evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration." Second Nature

Designs, 660 F. Supp. 3d at 1365 (quoting Mingus Constructors, Inc. v. United States,

812 F.2d 1387, 1391 (Fed. Cir. 1987)).

**I.      Judicial Review in Tariff Classification Cases**

The court must "reach a correct result" in a tariff classification dispute. Jarvis

Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). The court "must

consider whether the government's classification is correct, both independently and in

comparison with the importer's alternative." Id. The plaintiff bears the burden of

establishing that Customs' classification of the imported merchandise was incorrect:

> Specifically, the importer must produce evidence (the burden of production
> portion of the burden of proof) that demonstrates by a preponderance (the
> burden of persuasion portion of the burden of proof) that Customs'
> classification decision is incorrect. The presumption of correctness certainly
> carries force on any factual components of a classification decision, such
> as whether the subject imports fall within the scope of the tariff provision,
> because facts must be proven via evidence.

Universal Elecs., Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997) (emphases in

original); see also Jarvis Clark, 733 F.2d at 878.

Once the plaintiff has met its burden, the court undertakes a two-step process to

ascertain the correct result. Faus Group, Inc. v. United States, 581 F.3d 1369, 1371

(Fed. Cir. 2009). As the United States Court of Appeals for the Federal Circuit has

explained:

> First, we ascertain the meaning of the terms within the relevant tariff
> provision and, second, we determine whether the merchandise fits within
> those terms. The first step presents a question of law that we review de
> novo, whereas the second involves a question of fact that we review for
> clear error. When, as here, no genuine dispute exists as to the nature of the
> subject merchandise, the two-step inquiry "collapses into a question of law
> [that] we review de novo."

Well Luck Co. v. United States, 887 F.3d 1106, 1110 (Fed. Cir. 2018) (citations

omitted).

Where "there is no factual dispute regarding the merchandise, its structure and

use, the resolution of the classification issue turns on the first step, determining the

proper meaning and scope of the relevant tariff provisions." Faus Group, 581 F.3d at

1372. The General Rules of Interpretation ("GRIs") "govern the classification of goods

within the HTSUS." Well Luck Co., 887 F.3d at 1111. In order "[t]o determine the

meaning of an HTSUS provision, the court applies the GRIs in numerical order,

beginning with GRI 1 and reaching subsequent GRIs if analysis under the preceding

GRI does not yield proper classification of the subject merchandise." Amcor Flexibles

Kreuzlingen AG v. United States, 560 F. Supp. 3d 1326, 1330 (CIT 2022). Under GRI 1,

"classification shall be determined according to the terms of the headings and any

relative section or chapter notes." GRI 1; see also Orlando Food Corp. v. United States,

140 F.3d 1437, 1440 (Fed. Cir. 1998).

HTSUS terms "shall be considered to be statutory provisions of law for all

purposes." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §

1204(c)(1), 102 Stat. 1107, 1149; <u>Libas, Ltd. v. United States</u>, 193 F.3d 1361, 1364

(Fed. Cir. 1999) ("[The] HTSUS is indeed a statute but is not published physically in the

United States Code."). When "a tariff term is not defined in either the HTSUS or its

legislative history, the term's correct meaning is its common or dictionary meaning in the

absence of evidence to the contrary." <u>Russell Stadelman & Co. v. United States</u>, 242

F.3d 1044, 1048 (Fed. Cir. 2001); <u>see also</u> <u>Carl Zeiss, Inc. v. United States</u>, 195 F.3d

1375, 1379 (Fed. Cir. 1999) ("Absent contrary legislative intent, HTSUS terms are to be

construed according to their common and commercial meanings, which are presumed

to be the same."). The court may interpret the terms of a tariff provision by "rely[ing]

upon its own understanding of the terms used and may consult lexicographic and

scientific authorities, dictionaries, and other reliable information sources." <u>Carl Zeiss,

Inc.</u>, 195 F.3d at 1379. The court may also consult Explanatory Notes ("ENs") published

by the World Customs Organization ("WCO") "[f]or additional guidance on the scope

and meaning of tariff headings and chapter and section notes." <u>DIS Vintage LLC v.

United States</u>, 456 F. Supp. 3d 1323, 1329 (CIT 2020). ENs are "not binding law," but

they are "generally indicative of the proper interpretation of a tariff provision." <u>Id.</u>

(quoting <u>Agfa Corp. v. United States</u>, 520 F.3d 1326, 1329 (Fed. Cir. 2008)).

<b>DISCUSSION</b>

Faced with a tariff classification dispute as a matter of law, the court must determine

the proper meaning of the tariff provisions' terms, as well as whether the imported

merchandise properly falls within the scope of the tariff provision. <u>Well Luck Co.</u>, 887

F.3d at 1110. Here, the parties do not dispute the terms of the tariff provisions, nor do

<b>Appx0014</b>

they dispute the nature of the imported merchandise. Pl.'s Ex. A, at 5; Pl.'s Mot. at 19;

Def.'s Mot. at 19, 21–22. Instead, the parties' dispute is limited to whether the imported

merchandise falls within the scope of the tariff provisions. Pl.'s Mot. at 21, 25; Def.'s

Mot. at 24.

The Federal Circuit has previously examined the scope of the disputed tariff

provisions in Gerson Co. v. United States ("Gerson II"), 898 F.3d 1232 (Fed. Cir. 2018).

Plaintiff acknowledges that the court "needs to follow the applicable case law from the

Federal Circuit, but [Plaintiff] would just like to make a record for potential appeal." Oral

Arg. at 16:39–17:52.[2] As part of its duty to reach the correct result, the court continues

in its analysis of the relevant tariff provisions' scope. See Jarvis Clark, 733 F.2d at 878.

---

[2] At oral argument, Plaintiff was asked to explain for each model of imported merchandise, "why Gerson [II]'s analysis and logic and rationale are not applicable." Plaintiff responded that "the Gerson [II] case errored in that case in disregarding its analysis under heading 8543. The court in that case said 'you know that it was a mere technicality that these terms were described by heading 8543 as machines and apparatus … technically yes. This describes these items' but then [it] just said, 'it's a mere technicality' and moved on past it. We think that was an error and that the court should have done a more complete analysis." When asked: "Your argument is that the Federal Circuit was wrong. Is that the argument?", Plaintiff responded: "We realize that this court needs to follow the applicable case law from the Federal Circuit, but we would just like to make a record for potential appeal on that issue." The court concluded by asking: "You have no facts distinguishing these other models, or anything else besides 'the Federal Circuit erred'? Is that correct? I just want that to be understood." Plaintiff responded: "Yes, your honor." Oral Arg. at 16:39–17:52.

## I.     Period 1

The imported merchandise during Period 1 includes what the parties have categorized as: 37 candle models, 93 string light models,[3] 10 table light models, 1 nightlight model, 16 path light models, and 2 lantern models. Consol. Compl. ¶¶ 7, 8; Pl.'s Mot. at 8; Def.'s Mot. at 6. The commonality between the different models of imported merchandise is that each article provides illumination by means of an internal LED semiconductor. Consol. Compl. ¶¶ 7, 8.

Customs classified the imported merchandise under heading 9405, dutiable at rates between 3.9% and 8% <u>ad valorem</u>. Customs' classified heading is:

**9405 (HTSUS 2013)**
Lamps and lighting fittings including searchlights and spotlights and parts thereof, not elsewhere specified or included; illuminated nameplates and the like, having a permanently fixed light source, and parts thereof not elsewhere specified or included:

Def.'s Mot. at 2.

Plaintiff contends that the imported merchandise is instead classifiable under heading 8543:

**8543 (HTSUS 2013)**
Electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof:

Pl.'s Mot. at 2.

—————————————————

[3] The parties do not establish which of the 93 string light models were imported during Period 1 as compared to Period 2.

**A.    The imported merchandise is properly classified under heading 9405.**

GRI 1 requires that classification be determined in the first instance "according to the terms of the headings and any relative section or chapter notes." For a lamp to be classifiable under heading 9405, it must "not elsewhere [be] specified or included." Similarly, chapter 94 note 1(f) provides that "[l]amps or lighting fittings of chapter 85" are excluded from chapter 94's scope. Because Plaintiff bears the burden of establishing that Customs' classification of the imported merchandise is incorrect, the court must determine whether Plaintiff has met its burden of showing that the merchandise is classifiable under chapter 85. See Universal Elecs., 112 F.3d at 492; see also Jarvis Clark, 733 F.2d at 876.

Plaintiff argues that the imported merchandise is classifiable under heading 8543, "[e]lectrical machines and apparatus, having individual functions …." The Federal Circuit explained that while the definitions of machine and apparatus "[are] not free of ambiguity," the terms refer to "equipment designed specifically to carry out a particular function." Gerson II, 898 F.3d at 1236 (citing Webster's New World College Dictionary 67 (4th ed. 2009) definition of "apparatus," as "any complex device or machine for a specific use," and of "machine," as "a structure consisting of framework and various fixed and moving parts, for doing some kind of work," and "any device thought of as functioning in such a way, as ... an electronic computer.").

Additionally, the court has held, and the parties do not dispute, that a "lamp" is "any of various devices for producing light or sometimes heat…." Gerson Co. v. United States ("Gerson I"), 254 F. Supp. 3d 1271, 1275 n.6 (CIT 2017); Trijicon, Inc. v. United

States, 686 F. Supp. 3d 1336, 1344 (CIT 2024); Pl.'s Mot. at 19; Def.'s Mot. at 19;

Webster's New World College Dictionary (3d ed. 1988). In examining the definition of

"machine" and "apparatus," lamps "serve a particular or specific use or function [of] …

illumination." Trijicon, 686 F. Supp. 3d at 1344; see also Gerson I, 254 F. Supp. 3d at

1276 ("As does any electric lamp, each [imported] article depends for illumination on the

operation of electricity. Also, it can be argued that these articles have 'individual

functions.'").

  The Federal Circuit explained that heading 8543's provision "does not exist in a

vacuum, and [the court] must read it in conjunction with other relevant provisions to

discern its meaning," including any relevant ENs. Gerson II, 898 F.3d at 1236–37. After

viewing the language of headings 8543 and 9405 "in their context and with a view to

their place in the overall statutory scheme," the Federal Circuit found that electrical LED

tea-light candles, despite meeting the definition of machine or apparatus, cannot be so

broadly classified under the terms of heading 8543. Id. at 1237. Specifically, the court

found that:

> If one were to read heading 8543 as covering [the plaintiff's electrical LED
> tea-light] candles, it would cover every electric lamp, because all such
> lamps use electricity to generate light. And, by operation of Note 1(f), such
> lamps could not be classified under heading 9405. In other words, heading
> 9405 would be constrained to only non-electric lamps. That reading, as the
> Trade Court noted, "would impose a specific, and drastic, limitation on the
> scope of heading 9405, HTSUS that the article description for that heading
> does not express or suggest." Gerson [I], 254 F. Supp. 3d at 1278. In fact,
> such a reading would effectively remove electric "searchlights" and
> "spotlights" from heading 9405 even though those devices are expressly
> provided for in that heading. See HTSUS [heading] 9405 ("Lamps and
> lighting fittings including searchlights and spotlights and parts thereof"
> (emphasis added)). We agree with the Trade Court, therefore, that [the

> plaintiff's electrical LED tea-light] candles do not fall within the heading 8543.

Id. (emphases in original).

The Federal Circuit further examined chapter 85's ENs to determine that heading 8543 is not a broad classification provision for all electrical lamps that serve the function of illumination. Id. at 1237–38 ("Chapter 85's ENs, by contrast, state that chapter 85 includes '[c]ertain electrical goods not generally used independently, but designed to play a particular role as components, in electrical equipment,' ... EN 85(A)(6) (emphasis added)"). In comparison, the Federal Circuit examined chapter 94's ENs to find that "chapter 94 was intended to include at least finished, standalone electrical lamps used in the home." Id. (emphases in original) ("[EN] 94.05(I), for example, states that the term 'lamps' in heading 9405 refers to lamps 'constituted of any material' and that use 'any source of light,' including 'electricity.' … That EN also provide examples of lamps that fall within the heading and includes those that are 'normally used for the illumination of rooms; ….").

When "read in conjunction with other relevant provisions to discern its meaning," the court finds that chapter 85's scope is generally limited to electrical lamps that are components within equipment, rather than those used independently in the home. See Gerson I, 254 F. Supp. 3d at 1278–79 (finding that "[i]n short, the 'lamps' that may be described as light bulbs and similar such electrical devices not used independently are classified generally within … chapter 85, and those that are used independently are classified generally within … chapter 94."). In contrast, lamps that are "independently

used," "suitable for household use," or "decorative" are classified under heading 9405. Id. at 1279.

Here, Plaintiff has not met its burden of showing that Customs' classification under heading 9405 was incorrect. The imported merchandise, including various lamps that the parties have categorized as candle models, string light models, table light models, a nightlight model, path light models, and lantern models, provide illumination by means of an internal LED. Consol. Compl. ¶¶ 7, 8; Pl.'s Mot. at 8; Def.'s Mot. at 6. The parties agree that the models are not used as individual components within larger machines. Pl.'s Ex. A, at 5; Def.'s Mot. at 21–22. Instead, each model of light is: independently used with solar-power, battery-power, and/or an external power source; suitable for household use; and used for utilitarian or decorative illumination. Pl.'s Ex. A, at 5; Def.'s Mot. at 21–22. As such, Customs' Period 1 classification of the merchandise was correct under heading 9405.[4] See Gerson I, 254 F. Supp. 3d at 1279; see also Gerson II, 898 F.3d at 1237–38.

## II.     Period 2

---

[4] The court concludes that no other heading classification is appropriate after independently considering other tariff classifications. See Jarvis Clark, 733 F.2d at 878; Trijicon, Inc. v. United States, 686 F. Supp. 3d 1336, 1341 n.4 (CIT 2024).

The imported merchandise during Period 2 includes what the parties have categorized as two LED artificial Christmas tree models[5] and 93 string light models.[6] Pl.'s Facts ¶¶ 5, 6, 22, 23. The string lights are described as LED lighting elements with plastic caps, copper wiring harnesses with plastic or rubber sheeting, long wires with LED light bulbs arranged along the wire, and powered by either an electrical power cord or solar energy. Pl.'s Facts ¶¶ 24, 25. String lights can be used for decorative lighting and in connection with Christmas or other holidays. Id. at 26.

Customs classified the imported merchandise under heading 9405, dutiable at rates between 3.9% and 8%, ad valorem:

**9405 (HTSUS 2017)**

Lamps and lighting fittings including searchlights and spotlights and parts thereof, not elsewhere specified or included; illuminated nameplates and the like, having a permanently fixed light source, and parts thereof not elsewhere specified or included.

_____

[5] Customs classified the imported Christmas trees under heading 9405. Consol. Compl. ¶ 18. In its cross motion for summary judgment, however, Defendant argues that the trees are more properly classified under subheading 9505.10.25, "[f]estive, carnival, or other entertainment articles … Articles for Christmas festivities and parts and accessories thereof: … Christmas ornaments … Other," duty free. Def.'s Mot. at 34. Plaintiff agrees. Pl.'s Resp. to Def.'s Cross Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. at 1–2, ECF No. 85. Because the trees, as decorative articles for Christmas holidays, meet heading 9505's terms, "festive articles," and subheading 9505.10.25 term, "ornament," the court concurs. See Midwest of Cannon Falls, Inc. v. United States, 122 F.3d 1423, 1427–28 (Fed. Cir. 1997). As such, summary judgment is entered for Defendant as to the artificial Christmas trees and they shall be reliquidated duty free as "festive articles" under subheading 9505.10.25.

[6] The parties do not establish which of the 93 string light models were imported during Period 2 as compared to Period 1.

Def.'s Mot. at 2.

    Plaintiff contends that the imported merchandise is classifiable under heading

8539:

> **8539 (HTSUS 2017)**
>> Electrical filament or discharge lamps, including sealed beam lamp units and ultraviolet or infrared lamps; arc lamps; light-emitting diode (LED) lamps; parts thereof.

Pl.'s Mot at 4.

### A.    The imported merchandise is properly classified under heading 9405.

    GRI 1 requires that classification be determined in the first instance "according to

the terms of the headings and any relative section or chapter notes." Plaintiff argues

that the imported merchandise is classifiable under heading 8539, "[e]lectrical filament

or discharge lamps, including sealed beam lamp units and ultraviolet or infrared lamps;

arc lamps; light-emitting diode (LED) lamps; parts thereof."[7] Pl.'s Mot. at 4 (emphasis

added). For a lamp to be classifiable under heading 9405, "[l]amps and lighting fittings,"

the language requires that it is "not elsewhere specified or included." Similarly, chapter

94 note 1(f) provides that "[l]amps or lighting fittings of chapter 85" are excluded from

chapter 94's scope. Because Plaintiff bears the burden of establishing that Customs'

classification of the imported merchandise is incorrect, the court must determine

whether Plaintiff has met its burden of showing that the merchandise is classifiable

_____

[7] Prior to the January 1, 2017 WCO amendment, heading 8539 only covered "[e]lectrical filament or discharge lamps, including sealed beam lamp units and ultraviolet or infrared lamps; arc lamps; parts thereof." HTSUS 8539 (2014). Therefore, the only change to the heading term following the amendment was the inclusion of "[l]ight-emitting diode (LED) lamps." HTSUS 8539 (2017).

under chapter 85. See Universal Elecs., 112 F.3d at 492; see also Jarvis Clark, 733

F.2d at 876.

As discussed above, "the 'lamps' that may be described as light bulbs and similar

such electrical devices not used independently are classified generally within HS

chapter 85, and those that are used independently are classified generally within HS

chapter 94." Gerson I, 254 F. Supp. 3d at 1279; see also Home Depot, U.S.A., Inc. v.

United States, 427 F. Supp. 2d 1278, 1283 n.5 (CIT 2006), aff'd, 491 F.3d 1334 (Fed.

Cir. 2007); Target Gen. Merch., Inc. v. United States, 392 F. Supp. 3d. 1326, 1334 (CIT

2019) ("[H]eading 9405 properly classifies the [LED string lights] as 'lamps and lighting

fittings.'").

Contrary to Plaintiff's assertions, the 2017 HTSUS amendment to heading 8539

does not alter the heading's scope to include independent, self-contained lamps.

Instead, the 2017 amendment adding "light-emitting diode (LED) lamps" provides for

LED light bulbs to be classifiable under heading 8539. See Gerson I, 254 F. Supp. 3d at

1279 (finding that heading 8539 "uses the term 'electric filament or discharge lamps' to

refer to various classes of goods that commonly may be described as electric light

bulbs").

In Gerson II, the Federal Circuit found that classifying electrical LED candle lights

under chapter 85 "would impose a specific, and drastic, limitation on the scope of

heading 9405." 898 F.3d at 1237. There, the plaintiff's electrical LED tea-light candles

could have "plausibl[y] [fell]" under a chapter 85 heading. Id. at 1236. However, by doing

so, "heading 9405 would be constrained to only non-electric lamps." Id. at 1238.

Similarly, here, the 2017 amendment cannot be read to increase the scope of heading

8539 to include lamps "commonly … described as electric light bulbs," as such an

interpretation would drastically limit heading 9405 "to only <u>non</u>-electric" and non-LED

lamps. <u>Gerson II</u>, 898 F.3d at 1237 (emphasis in original); <u>see also</u> <u>Gerson I</u>, 254 F.

Supp. 3d at 1278. Because "[the court] must read [heading 8539] in conjunction with

other relevant provisions to discern its meaning," it is clear that the types of lamps

classifiable under heading 8539 are those commonly referred to as light bulbs. <u>See</u>

<u>Gerson II</u>, 898 F.3d at 1236. In comparison, heading 9405 includes "decorative articles

that also serve an illuminative function" and "finished, standalone electric lamps used in

the home." <u>Id</u>. at 1236, 1238.

        Here, Plaintiff has not met its burden of showing that Customs incorrectly

classified Plaintiff's various string light models under heading 9405. It is undisputed that

Plaintiff's string light models are "standalone electric lamps," as each model is

composed of LED lighting elements and utilizes solar power, batteries, or an external

power source via an electrical power connector. <u>Gerson II</u>, 898 F.3d at 1237; Pl.'s Facts

¶¶ 24–25; Def.'s Facts ¶¶ 24–25. Plaintiff further provides that the string light models

"are used for decorative lighting in connection with Christmas or other holiday activities"

and come in a variety of colors, shapes, and sizes ranging from multi-colored and pear-

shaped to plastic ghosts. Pl.'s Facts ¶ 26; <u>e.g.</u>, Pl.'s Ex. C, Part 2, at 1307, 1357.

Because the string light models are independently used, suitable for household use,

and decorative, Plaintiff's string light models cannot be classified under heading 8539,

as doing so "would impose a specific, and drastic, limitation on the scope of heading

9405." <u>Gerson II</u>, 898 F.3d at 1237. Because heading 9405 includes "lamps … not elsewhere specified or included," Customs' classification of the Period 2 imported merchandise was correct.

### III.    Classification of String Light Models at the Subheading Level

Finally, the court must decide whether Customs properly classified Plaintiff's various string light models under HTSUS subheading 9405.30.00, "[l]ighting sets of a kind used for Christmas trees." Plaintiff argues that "[i]f the [c]ourt determines that HTSUS [c]hapter 85 does not cover the subject articles," then any string light models "which feature cording [sic] in black, white, or any color other than green" or "are of lengths or sizes not suitable for use on Christmas trees," are instead classifiable under 9405.40.80, "[l]amps and lighting fittings including searchlights and spotlights and parts thereof, not elsewhere specified or included; … Other electric lamps and lighting fittings: Other." Consol. Compl. ¶¶ 40–43.[8]

Plaintiff bears the burden of establishing that Customs' classification of the imported merchandise is incorrect. <u>Jarvis Clark</u>, 733 F.2d at 876. This must be shown through "evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) … because <u>facts</u> must be proven via <u>evidence</u>." <u>Universal Elecs.</u>, 112 F.3d at 492 (emphases in original). It is only once a plaintiff has met its burden that the court

---

[8] Plaintiff does not address this argument in subsequent briefing, nor does Defendant address this argument.

undertakes a two-step process to ascertain the correct result. <u>Faus Group</u>, 581 F.3d at

1371–72; <u>Jarvis Clark</u>, 733 F.2d at 878; <u>see also</u> <u>Victoria's Secret Direct, LLC v. United

States</u>, 908 F. Supp. 2d 1332, 1338 (CIT 2013), <u>aff'd</u>, 769 F.3d 1102 (Fed. Cir. 2014)

("Once imported merchandise is determined to be classifiable under a particular

heading, a court must look to the subheadings to find the correct classification of the

merchandise in question.").

To classify merchandise under subheading 9405.30.00, "[l]ighting sets of a kind

used for Christmas trees," two elements must be met: (1) the good is a "lighting set,"

including those goods that are part of "the general class of lights on strings"; and (2) the

lighting set is "principally used for Christmas trees," rather than for other purposes such

as general decoration or illumination. <u>Primal Lite, Inc. v. United States</u> ("<u>Primal Lite I</u>"),

15 F. Supp. 2d 915, 917 (CIT 1998), <u>aff'd</u>, 182 F.3d 1362 (Fed. Cir. 1999); HTSUS

9405.30.00. The parties agree, and the court concurs, that the imported merchandise at

issue consists of lighting sets within the general class of lights on strings. Pl.'s Mot. at 9;

Def.'s Mot. at 8; <u>Primal Lite I</u>, 15 F. Supp. 2d at 917. The issue is therefore whether

Plaintiff has met its burden of establishing that the imported string light models are not

principally used for Christmas trees. <u>Primal Lite, Inc. v. United States</u> ("<u>Primal Lite II</u>"),

182 F.3d 1362, 1364 (Fed. Cir. 1999) ("The government contends that subheading

9405.30.00 is a 'principal use' provision …. We agree.").

In determining principal use, the court must rely on the undisputed record and the

article itself. <u>Target Gen. Merch.</u>, 392 F. Supp. 3d at 1331 ("Based on the parties'

submissions and the court's examination of the submitted samples, there can be no

genuine issue of material fact that the lighting sets at issue are not principally used as

Christmas tree lights and are not fungible with Christmas tree lights."); see also Primal

Lite II, 182 F.3d at 1365 ("[Plaintiff's] affidavit established that the principal use of [its]

imported goods was not for Christmas trees, and the government provided no evidence

that those goods and those commercially fungible with them are principally used for

Christmas trees."). The court additionally looks to the record to consider "the group of

goods that are commercially fungible with the imported goods." Primal Lite II, 182 F.3d

at 1365. Commercial fungibility between imported merchandise and a class or kind of

merchandise is determined by evaluating all "pertinent circumstances," such as: the

merchandise's general physical characteristics; how the merchandise is advertised and

displayed; and the expectations of the ultimate purchasers. United States v.

Carborundum Co., 536 F.2d 373, 377 (CCPA 1976).

      Here, Plaintiff argues generally that any string light models "which feature cording

[sic] in black, white, or any color other than green" or "are of lengths or sizes not

suitable for use on Christmas trees are not lighting sets of a kind used on Christmas

trees." Consol. Compl. ¶¶ 40–43. However, Plaintiff does not provide evidence that the

string light models in dispute are not intended for use on Christmas trees.[9] For example,

where the court relied on a plaintiff's affidavit and the physical evidence to determine

that certain non-green colored corded lights would not be principally used for Christmas

―――――――――――――――――

[9] Notably, Plaintiff does not assert which of the 93 string light models over Period 1 and
Period 2 were classified incorrectly. Consol. Compl. ¶¶ 40–43.

trees, no such affidavit or evidence exists here. See Target Gen. Merch., 392 F. Supp.

3d at 1336.

Plaintiff's evidence does not distinguish which, if any, of the imported string light

models are not principally used for Christmas trees. Plaintiff's witness, Target's Senior

Buyer, Christina Jarvis, asserted that string light models with department class item

DPCI 051 are sold during the Christmas season in Target's Trim-a-Tree Christmas

department. Jarvis Dep. At 80:6–18. However, when asked, "[d]o you know what makes

a light of a kind used on a Christmas tree versus one that's not?," Jarvis responded:

> I don't think there's a distinguishing factor. I think it could be used – it could
> be used on Christmas trees, but it could be used in other ways as well. This
> goes back to like it could be used on the exterior of your home. It can be
> used on a garland. It could be used on a pergola just for like ambient lighting
> outdoors year-round.

Jarvis Dep. 137:7–17. Plaintiff also has provided no evidence demonstrating the

packaging or consumer expectations of each model of string lights.

Because Plaintiff fails to provide evidence demonstrating that the string light

models are not principally used for Christmas trees, Plaintiff has failed to meet its

burden of establishing that Customs' classification is incorrect. Primal Lite I, 15 F. Supp.

2d at 917; Jarvis Clark, 733 F.2d at 876. As such, Defendant's classification will not be

disturbed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **DENIED**

and Defendant's cross motion for summary judgment is **GRANTED**. Judgment shall be

entered accordingly.

/s/    Lisa W. Wang
Lisa W. Wang, Judge

Dated:   August 13, 2025
       New York, New York